211 So.2d 110 (1968)
Julius COTTEN et ux.
v.
TRANSAMERICA INSURANCE CO. et al.
No. 7390.
Court of Appeal of Louisiana, First Circuit.
May 27, 1968.
*111 Robert L. Kleinpeter of Kleinpeter & Salassi, Baton Rouge, for appellants.
E. Drew McKinnis of McGehee & McKinnis, Baton Rouge, for appellees.
Before LANDRY, BAILES and CUTRER, JJ.
LANDRY, Judge.
Defendant, Transamerica Insurance Co. (Transamerica) has taken this appeal from a judgment awarding plaintiff, Jewel B. Cotten, damages for personal injuries and property losses sustained in an intersectional collision involving an automobile operated by plaintiff and an unmarked police vehicle owned by defendant's insured, the East Baton Rouge Parish Sheriff's office. At the time of the accident the police car was being driven on an emergency call by former detective, Alvin E. Courtney. A stipulation of record recognizes Mrs. Cotten as the sole remaining plaintiff due to the death of her husband, Julius Cotten, prior to trial. The trial court rendered judgment in favor of plaintiff in the aggregate of $10,133.40, representing personal injuries in the sum of *112 $6,750.00 and special damages totaling $3,383.40. We find no error in the trial court's judgment and affirm the decision rendered.
The accident happened at approximately 4:15 P.M. on the afternoon of April 30, 1965, a clear, dry day. The site of the mishap was the intersection of North Acadian Thruway (Acadian), a four lane north-south main traffic artery of the City of Baton Rouge, and Winbourne Street (Winbourne), a two lane east-west thoroughfare. The two northbound lanes of Acadian are separated from the southbound lanes by a median strip measuring twenty-four inches in width by six in height. The two paved lanes of Winbourne are a total of twenty-eight feet in width. The movement of traffic through the intersection is controlled by a single electric semaphore signal suspended over the center of the crossing. White stop lines are painted across the northbound lanes of Acadian 26 feet south of the south parallel of Winbourne indicating that northbound motorists should stop at that point when faced with a stop signal. Plaintiff was proceeding northerly in the right or outside lane of Acadian on a green or go signal. Detective Courtney, accompanied by an associate, Deputy O'Conner, was traveling easterly on Winbourne and attempting to negotiate the intersection against a red or stop signal. The collision occurred five feet west of the east parallel of Acadian, 17 feet east of the center median of Acadian and 6 feet north of the south parallel of Winbourne. Stated otherwise, the impact took place in the southeast quadrant of the outside northbound lane of Acadian. The front door and fender. No skid marks the police vehicle in the area of its right front door an fender. No skid marks were left by the unmarked cruiser. Plaintiff's vehicle laid down 14 feet of skid marks commencing just south of the south parallel of Winbourne. Following the collision, plaintiff's automobile came to rest in the intersection facing in a generally northerly direction. The police car came to rest on the east shoulder of Acadian 164 feet from the point of impact. It is conceded the Sheriff's car was dark green in color and bore no insignia or emblem identifying it as a law enforcement vehicle. Neither was the official car equipped with an externally mounted siren or warning light. Instead, it was equipped with a concealed siren installed under the hood and a portable, hand-held manually operated, red flashing light. This portable warning light was designed for installation on the dashboard of most vehicles but the automobile in question was so constructed that the light could not be mounted in this manner and so was being held by O'Conner. The light could be operated either as a spotlight or as a flashing red warning signal by attaching thereto a readily replaceable and removable red lens. O'Conner had rigged the device as a flashing warning red signal and was so operating it at the time. The siren operated by means of a push button situated under the dash within reach of the driver. To activate the siren, the driver manually depressed the switch with one hand; to turn the siren off, he merely released the button. Since the police vehicle was not equipped with an automatic transmission, manual shifting of gears was required in the vehicle's operation.
Plaintiff contends defendant was solely responsible for the accident in attempting to negotiate the intersection against an unfavorable signal in an unmarked police vehicle while traveling at an excessive rate of speed and failing to give audible or visible warning of its approach. Defendant maintains plaintiff was solely responsible in failing to yield the right of way to a police vehicle lawfully traversing an intersection in accordance with statutory law. Alternatively, defendant argues plaintiff was guilty of contributory negligence barring her recovery.
Defendant avers the trial court erred in the following respects: (1) Finding Courtney negligent in the manner in which he *113 entered the intersection; (2) holding plaintiff free of contributory negligence in failing to see and hear what she should have seen and heard under the circumstances; (3) awarding plaintiff excessive damages for personal injuries, and (4) condemning Transamerica for a sum in excess of its policy limits of $10,000.00.
The statutory provisions pertinent to a decision herein are as follows:
"La.R.S. 32:24 Emergency vehicles; exceptions
A. The driver of an authorized emergency vehicle, when responding to an emergency call, * * * may exercise the privileges set forth in this Section, but subject to the conditions herein stated.
B. The driver of an authorized emergency vehicle may:
* * * * * *
(2) Proceed past a red or stop signal or stop sign, but only after slowing down or stopping as may be necessary for safe operation;
* * * * * *
C. The exceptions herein granted to an authorized emergency vehicle shall apply only when such vehicle is making use of audible and visual signals sufficient to warn motorists of their approach, except that a police vehicle need not be equipped with or display a red light visible from in front of the vehicle.
D. The foregoing provisions shall not relieve the driver of an authorized vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others.
La.R.S. 32:125 Procedure on approach of an authorized emergency vehicle
A. Upon the immediate approach of an authorized emergency vehicle making use of audible and visual signals, or of a police vehicle properly and lawfully making use of an audible signal only, the driver of every other vehicle shall yield the right of way and shall immediately drive to a position parallel to, and as close as possible to, the right hand edge or curb of the highway clear of any intersection, and shall stop and remain in such position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer.
B. This section shall not operate to relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the highway."
Title 11, Sections 47 and 48, Baton Rouge City Code, are substantially similar to the above cited statute.
In view of the applicable statute, to exonerate a police vehicle from negligence in proceeding against an unfavorable traffic signal or light, three conditions must be fulfilled. First, the vehicle must be proceeding in response to an official emergency call. Secondly, it must have slowed down or stopped to the extent required for safe operation under the attending circumstances. Thirdly, it must be utilizing at least an audible signal sufficient to warn and alert motorists of its approach.
Plaintiff maintains the police car proceeded improperly into the intersection inasmuch as it did not stop or slow its speed and neither did it warn of its approach by means of an audible signal device. Defendant concedes Courtney was proceeding on an unfavorable traffic signal but contends he complied with all provisions of the applicable statute. In this regard it is averred Courtney came to a stop before entering the intersection and was continually sounding its siren on and off. Additionally, defendant urges that O'Conner exhibited the flashing red light first to stop southbound traffic on Acadian, following which the vehicle proceeded *114 slowly into the intersection while O'Conner displayed the blinking light to northbound motorists and Courtney proceeded to traverse the northbound lanes only after having stopped in the center of the intersection under the traffic signal.
With the scene thus set and the contentions of the litigating parties stated, we pass to a consideration of the evidence since the question posed is obviously one of fact. It is agreed Detective Courtney was on an emergency mission.
Plaintiff, Mrs. Cotten, testified she was headed north in the outside lane of Acadian just prior to the impact. She was traveling at a speed of approximately 25 miles per hour in relatively heavy traffic. As she approached the crossing, she noted the light was favorable for her to proceed so she "followed the flow of traffic." A car ahead in the outside lane preceded her through the intersection. She was sure there was at least one car to her left in the inside northbound lane but was unable to state with certainty how many additional vehicles were in the inside lane, if any. Mrs. Cotten did not see the police car until the instant of impact. She did not recall applying her brakes prior to the collision, but since the investigating officer found 14 feet of skid marks made by her vehicle, she imagined she must have applied her brakes upon seeing the other automobile. Mrs. Cotten did not see a flashing red light neither did she hear a siren. The window on her side of her car was approximately two-thirds down. Neither her radio nor air conditioner were in operation at the time.
Mrs. Willie Mae Dear, a school teacher, called on behalf of plaintiff testified she was driving south in the inside lane of Acadian, her vehicle being second in line waiting for the traffic light to change from stop to go. When the light turned green, the vehicle ahead proceeded through the intersection. Mrs. Dear then moved forward and, glancing to her right, noted the approach of a black car proceeding easterly on Winbourne. Realizing the oncoming vehicle was traveling too fast to stop, Mrs. Dear stopped her own vehicle short of the intersection. In her judgment the approaching vehicle was traveling approximately 30 to 35 miles per hour and neither stopped nor slowed its speed at any time before entering the intersection and striking plaintiff's automobile. According to Mrs. Dear, plaintiff's automobile was in the inside northbound lane of Acadian and just before the accident another car in the outside northbound lane turned right and entered Winbourne proceeding easterly. She stated that her windows were down and that she neither heard a siren nor observed any warning light displayed by the police car which bore no identifying emblem. She noted two men in the police car, one driving and the other seated in the rear seat. The air conditioner on her automobile was not in operation and there was nothing to prevent her from hearing a siren had one been in operation.
Former City Police Officer M. C. Bergeron investigated the accident. Upon personal observation and measurement, he fixed the point of impact, noted the presence of skid marks left by the Cotten automobile and placed the location of the vehicles following the collision as hereinabove set forth. Mr. Bergeron found a red portable signal light on the floor of the police vehicle but observed no siren. He stated that unmarked police cars are usually equipped with small sirens mounted either under the hood or between the car's radiator and grille. He described the sound produced by such a siren as a muffled noise similar to or sounding like "a bumble bee in a fruit jar." According to Bergeron, a siren of this type does not produce a wailing sound of the kind customarily heard on ambulances, fire engines and police vehicles. Based on his interrogation of both drivers, he was of the opinion that there was at least one car stationary in the inside northbound lane of Acadian, the presence of which blocked each driver's view of the other.
*115 Mr. Alvin E. Courtney testified he was a former detective in the employ of the Sheriff of East Baton Rouge Parish. Shortly prior to the accident, he received a call from his teenage daughter to the effect that an unidentified male was following her in an automobile as she was returning home from high school. Upon receiving this message, Courtney and his partner, O'Conner, left immediately in their assigned vehicle, an unmarked police car used by members of the detective squad. The vehicle was equipped with a small siren mounted under the hood and operated by a button or switch within the driver's reach. Additionally, the vehicle was provided with a portable flashing red signal light operated by plugging the device into the cigarette lighter receptacle. From the moment the vehicle left the Sheriff's office, the siren was constantly turned on and off and the red blinker light put in operation by O'Conner who held it in his hands and pointed it in the direction of approaching vehicles at each intersection encountered. Courtney brought his vehicle to a complete stop before entering Acadian. O'Conner pointed the red blinker light toward southbound traffic on Acadian and when both said lanes came to a halt, Courtney drove slowly into the intersection as O'Conner directed the light toward northbound traffic on Acadian. Courtney also stated that when traffic on the inside northbound lane of Acadian came to a halt, he proceeded easterly across the inside northbound lane and then again halted directly beneath the traffic signal. He glanced to his right to observe for northbound traffic in the outside lane and almost simultaneously O'Conner, who was also looking southerly, informed him the way was clear. He then proceeded forward and was immediately struck by plaintiff's vehicle. At no time prior to the impact was he aware of the approach of plaintiff's automobile. Courtney did not recall any vehicle negotiating the intersection ahead of plaintiff. He also stated there was a line of cars stopped in the inside northbound lane of Acadian but he was unable to say how many. After the impact, his car came to a complete stop as he had his foot on the brake. When he released the brake, his accelerator apparently jammed and the car started forward. He steered the vehicle between a sign and a post situated at the northeast corner of the intersection and directed it onto the east curb of Acadian heading in a northerly direction. According to Courtney, he again applied his brakes, shut off the ignition and brought the vehicle to a halt at the point indicated by Officer Bergeron. Courtney was of the opinion that whereas the siren was mounted beneath the car's hood, it was loud enough to be heard. He acknowledged that he was driving with one hand and manipulating the siren with the other.
In essence Deputy George O'Conner corroborated Courtney's testimony in virtually every detail.
In large measure Courtney's version of the accident was substantiated by the testimony of Billy Joe Ferguson who stated he had been following Courtney for several blocks prior to the accident. The siren attracted his attention and prompted him to follow the police vehicle out of curiosity. At the time of collision he was directly behind the police car. Ferguson saw Courtney stop before entering the intersection and again in the center beneath the traffic light. As Courtney attempted to "ease" across the outside northbound lane, his vehicle was struck. He saw plaintiff's car when it was from 15 to 25 feet distant from the police car but could not estimate plaintiff's speed in such a short distance. Ferguson also testified that when Courtney entered the intersection, the light was red but it turned yellow and must have been either yellow or green for traffic on Winbourne when the impact occurred. He testified the siren emitted a steady noise which he readily heard as all his windows were down.
Major Edward O. Bauer, Jr., head of the Traffic Department of the Baton *116 Rouge City Police, testified that none of the traffic lights in the city change from red to yellow to green.
We conclude, as did the trial court, that Detective Courtney is not entitled to herein claim the benefits and privileges of LSA-R.S. 32:24 and LSA-R.S. 32:125 because the siren in question did not emit an audible signal sufficient to warn a reasonably alert motorist of the approach of an emergency vehicle. What constitutes compliance with the statutory requirement that the signal must be "sufficient to warn motorists" is, of course, a factual issue to be determined in the light of the circumstances of each particular case. It is obvious, however, that the sound must be of such a nature as clearly characterizes it as a warning device and of such volume and intensity as to be heard by a motorist possessed of average hearing.
A reasonably prudent and alert driver must perforce be charged with the responsibility of recognizing and heeding a siren emitting the familiar shrieking sound to which the motoring public has long been accustomed. We do not mean to imply that the easily recognizable piercing wail of modern day sirens may not be changed by those authorities in whose hands the decision rests. Nevertheless, a siren sounding like a "bumble bee in a jar" (which the record describes simply as a "muffled sound"), is another matter entirely. We seriously question that an ordinary, reasonably prudent driver would recognize such a sound or noise as a warning device on an emergency vehicle such as a police car, ambulance or fire engine. In addition to being recognizable as a warning sound, the volume of the noise must be such as to be audible to a reasonably alert driver. In the case at hand the siren was mounted beneath the hood of the vehicle which circumstance unquestionably reduced its volume. While we do not infer that such devices may not be "hidden" to preserve the unmarked character of official vehicles when such effect is necessary and desirable, nevertheless the instrument, whatever the method of installation, must give forth a noise of sufficient volume to be heard by motorists within a reasonable distance. We conclude first that the sound of the siren in question was of insufficient intensity to meet the statutory requirement. We also conclude the nature of the sound was such that even if Mrs. Cotten had heard it, she could not have reasonably been expected to identify it as a warning device on an emergency vehicle.
The trial court held Detective Courtney negligent in traveling through the intersection at an excessive rate of speed in an unsafe manner and on an unfavorable traffic signal. In these conclusions we concur. We believe the evidence preponderates to the effect that Courtney did not stop as he and O'Conner testified. This finding we believe corroborated by the distance traveled by the police car following the accident. If Courtney stopped under the traffic light as he contends, his car thereafter traveled no more than five or six feet forward before being struck. In such a short distance it could not possibly have attained sufficient speed to proceed an additional 164 feet as the record indicates. We are also inclined to discount Courtney's explanation that his car traveled the distance shown following the impact because its accelerator jammed. It is significant that this exculpatory statement was not tendered to the investigating officer. Being a police officer himself, it is most unlikely that Courtney would have neglected to impart this salient exonerative circumstance to the investigating officer. Moreover, if the police vehicle were proceeding with the caution indicated by Courtney and O'Conner, it is most improbable that they would both have failed to note the approach of the Cotten vehicle.
Nor do we find any substantiation of the charge of negligence and alternative *117 contributory negligence lodged against Mrs. Cotten. She was proceeding at a lawful rate of speed on a favorable traffic light. Under the well established jurisprudence, she was entitled to proceed through the intersection assuming that motorists on Winbourne would obey the unfavorable traffic signal which faced them and yield the right of way to vehicles on Acadian. Kientz v. Charles Dennery, 209 La. 144, 24 So.2d 292. Her assumption in this regard was further justified by the fact that we find from the evidence at least one car ahead of her in the outside lane safely proceeded into or through the intersection when the light exhibited a go signal.
Calvert Fire Insurance Company v. Hall Funeral Home, La.App., 68 So.2d 626, cited and relied upon by appellant, is not factually apposite to the case at bar. In the quoted authority a motorist was held negligent for failing to yield to an ambulance equipped with what the record discloses to be a regular siren. In addition the emergency vehicle was also provided with flashing red lights attached to its front bumper and top. The vehicle involved in the instant case was not so rigged or equipped.
In the case at bar plaintiff cannot be charged with failure to hear a warning sound she should have heard. We find from the evidence the noise emitted by the siren was first of all not readily recognizable as a warning sound and secondly not sufficiently loud to warn a reasonably prudent and alert driver. The record leaves grave doubt that the siren was in fact operating. Both Mrs. Dear and plaintiff testified they heard no siren. Detective Courtney and Deputy O'Conner stated the siren was turned on and off from the time they left the Sheriff's Office. Since the vehicle was equipped with a manual shift it would be somewhat difficult for Courtney to drive, depress the siren control button and maneuver the vehicle through the intersection all at the same time. Nor does the mere presence of vehicles stopped in the inside northbound lane serve to charge plaintiff with knowledge of the approach of the emergency car. In this regard the only witness who testified to stopping on Acadian was Mrs. Dear who stated unequivocally that she did not stop because she heard a siren but because she observed the approach of the police car and concluded it would run the red light.
Plaintiff's treating physician, Dr. Jere D. Melilli, first saw plaintiff on May 8, 1965, at which time plaintiff's condition was diagnosed as severe cervical strain. The initial visit disclosed muscle spasm in the posterior and lateral neck muscles extending into the patient's mid-back and beneath the left shoulder blade. Dr. Melilli prescribed injections of muscle relaxants and physical therapy. On May 12, 1965, use of a Thomas Collar was recommended to hold plaintiff's head in a rigid position in an effort to alleviate her pain. This treatment proving ineffective, plaintiff was admitted to a hospital on June 2, 1965, and placed in traction for ten days. X-rays taken during this period of confinement revealed a congenital defect in one of plaintiff's cervical vertebrae. Thereafter, plaintiff was seen on numerous occasions and continued to receive injections of muscle relaxants and repeated therapy. However, because of persistent complaints of pain in the neck, shoulder and left arm, plaintiff was again hospitalized and placed in traction from September 27, 1965, to October 14, 1965. Between October 14, 1965, and August 23, 1967, Dr. Melilli saw plaintiff approximately 40 times for complaints associated with injuries received in the accident. On each occasion he prescribed virtually the same treatment, namely, muscle stimulation, ultrasonic sound applications and injections of muscle relaxants. It suffices to say that during this period he found intermittent objective symptoms in the form of muscle spasm in the affected area. On August 16, 1967, Dr. Melilli noted slight cervical muscle spasm and on his final visit, August 23, *118 1967, he observed no such symptom. In Dr. Melilli's opinion, plaintiff was quite likely to suffer future pain, especially during atmospheric changes and after long hours of performing her occupation of bookkeeper which requires considerable neck and back bending.
Dr. Charles B. Cracraft, Orthopedic Surgeon, examined plaintiff on August 16, and October 13, 1965. On both occasions he found evidence of cervical muscle spasm. He recommended plaintiff's treatment be gradually decreased and that she return to her regular activities.
Plaintiff was seen by Dr. William E. Smith, Orthopedic Surgeon, on one occasion in May, 1967. At this time plaintiff was complaining of difficulty with her neck, shoulders and upper back. Dr. Smith found no objective symptoms which substantiated plaintiff's complaints.
Dr. Joseph M. Edelman, Neurologist, examined plaintiff in July, 1967, and found no evidence of central nervous system damage or injury. Like Dr. Smith, he could find no reasons for plaintiff's complaints of pain and discomfort.
Plaintiff testified that since the accident she has experienced headaches and pain in the neck, shoulders and arms. The condition is aggravated by weather changes and is intensified after hours of work as a bookkeeper. She also stated that before the accident, she was engaged as a beautician and kept books for her husband (a mechanic). Since the accident, however, she has been unable to pursue her occupation as beautician because she is unable to keep her arms upraised for extended periods as required of a beautician. Because of her present condition she has accepted a position of bookkeeper full time.
We find no merit in appellant's contention the award to plaintiff for personal injuries is excessive. In this respect defendant argues plaintiff was not permanently disabled and neither did her injuries produce severe pain. Rather, it is contended, plaintiff has suffered only a protracted interval of residual discomfort. Additionally, appellant avers much of plaintiff's difficulty resulted from congenital cervical defects, a previous neck injury and severe emotional strain due to marital difficulties.
Dr. Melilli's testimony discloses, however, that the extensive medical treatment accorded plaintiff for a period of about one year following the accident, was due primarily to the injuries received. It further appears that plaintiff's congenital condition was aggravated by the accident and the fact that she had had a similar prior accident also contributed to the duration of her pain and discomfort. While unquestionably some of plaintiff's difficulty was due to emotional strain unassociated with the accident, nevertheless, in view of the circumstances detailed, we consider the award reasonable and proper. Especially so in view of Dr. Melilli's conclusion that plaintiff will continue to suffer intermittently.
Also without merit is the contention that the trial court awarded total damages in excess of Transamerica's policy limits of $10,000.00. Defendant's policy restricts its liability to $10,000.00 for personal injuries to one individual and $5,000.00 property damages for a single accident. The record discloses that the award to plaintiff exceeds $10,000.00 because it includes an allotment for property damages, therefore, the amount for which defendant has been cast is within the limits of its exposure.
Accordingly, the judgment of the trial court is affirmed, all costs to be paid by appellant, Transamerica Insurance Company.
Affirmed.